OPINION OF THE COURT
Michael L. Pesce, J.
Defendant’s trial on charges of weapons possession and reckless endangerment began in this court on November 13, *568 1987. At the time of the trial the defendant was free on bail, and Parker warnings were given. The trial continued on November 16, 17 and 18. On Thursday, November 19, the court charged the jury and they retired to deliberate. No verdict having been reached by the end of the day, the jury was sequestered.
When the trial resumed on the morning of Friday, November 20, the defendant’s attorney informed the court that his office had received a phone message from a woman, purporting to be a friend of the defendant’s family, who informed the attorney’s secretary that the defendant had been hospitalized, and was unable to come to court.
The court instructed the defendant’s attorney to phone Interfaith Hospital to confirm this information. The attorney made the call from the courtroom and was told that Peter Richards was a new admission patient. The jury subsequently alerted the court that a verdict had been reached. After discussion, defense counsel declined to have the defendant’s absence explained to the jurors. The court thereupon called for the jury and the verdict of guilty was announced. The jurors were polled individually and the unanimous verdict confirmed.
Defense counsel made a standard motion to set aside the verdict and the court denied this request. The jury was discharged. When the court indicated its intention to issue a forthwith bench warrant, counsel requested an hour’s adjournment, during which he further investigated the situation. He then indicated (for the first time) that he had not waived his client’s presence by going forward, and, when asked when he thought the sentence could take place, suggested that it be held when the defendant was "immediately available”.
Defendant’s attorney contends that at no time did the defendant waive his right pursuant to CPL 260.20 and the United States and New York State Constitutions to be present during any facet of his trial. The taking of the verdict in his absence, it is claimed, amounted to a denial of due process. The defendant argues that, at the very least, the taking of the verdict should have been postponed. Accordingly, he submitted a written motion for an order setting aside the jury’s verdict of guilty and dismissing the indictment.
After receiving the People’s answer, this court decided to hold a hearing with the clear understanding, stated on the record by the court, that if the defendant was able to establish *569 that he could have been present in the courtroom within a reasonable time after the jury reached a verdict, the court would set aside the verdict and order a new trial.[1]
At the hearing, it was established that the defendant was initially admitted to the emergency room at Interfaith Medical Center’s St. John’s Division at midnight, Thursday, November 19th, for treatment of a gunshot wound. Due to the extent of his injuries, however, he was soon transferred to the Brooklyn Jewish Division, which was equipped to perform cardiovascular studies on his arm (at ll).[2]
Dr. Barbara Freeman, a full-time orthopedic surgeon employed at Interfaith Medical Center, testified as an expert witness for the People that she treated the defendant from the time of his arrival at Brooklyn Jewish. When she first examined the defendant, he was hemodynamically stable and he had a gunshot wound to the right arm and the right chest wall (at 12). Dr. Freeman described the wound on the outer side of his arm as having been "about the size of a grapefruit” and explained that since the two wounds were against each other, the defendant had suffered "full thickness skin loss” in these areas, meaning that the whole area of skin was removed (at 13).
Surgery was first performed on the defendant on the morning of November 20th. Dr. Freeman performed a procedure known as debridement, in which dead tissue was removed, and applied an external fixator to his arm. She explained that pins were placed into the defendant’s arm and a frame placed on the outside of his arm to stabilize it (at 14). During the surgery, the defendant received intravenous (i.v.) antibiotics and pain medication, and cultures were taken of his wounds (at 14).
Dr. Freeman further testified that the defendant’s blood count dropped dramatically over several days following his admission. This decline, she explained, was indicative of "a significant blood loss” amounting to a loss of "a third of his blood volume” (at 15). The defendant also suffered bone damage; in medical parlance, he had a "markedly comminuted *570 fracture of the midshaft of the humorous”, meaning that the bone in his arm was in "many, many pieces” (at 16). After the surgery, the defendant received intravenous antibiotics and at least one blood transfusion.
The defendant underwent surgery a second time on Monday morning, November 23rd, in what is referred to as a "second-look” operation (at 21). Additional dead tissue was removed and the type of fixator (the outside holding device) was changed (at 22). After the second-look operation, the defendant continued to receive intravenous antibiotics, and was still receiving them on November 25, when he was transferred to Kings County Hospital (KCH) for additional procedures. At that point, he was in stable condition. On December 3rd, at Kings County Hospital, the defendant underwent a third surgery. More nonviable tissue was removed (debridement), the fixator changed, and a skin graft performed down to his arm (at 24). He continued to receive intravenous antibiotics every six hours up until December 18th. After that date, local wound care was continued until his discharge on January 7, 1988.
Based upon her examination of the defendant and her review of his medical records, Dr. Freeman concluded that she would not have permitted the defendant to come to court while he was still receiving intravenous antibiotics at KCH (at 26). She stated that, while it would have been possible to physically transport the defendant to court by ambulance prior to the second-look surgery on Monday, November 23rd (at 29), it could have jeopardized his life (at 30). Moreover, she eliminated the possibility of transporting him to court in a wheelchair, due to his low blood count (at 29-30).
Nor would it have been advisable to bring the defendant into court after the second-look surgery (i.e., on Nov. 25th), despite the fact that on that day the defendant was able to be transferred by ambulance from Brooklyn Jewish to Kings County Hospital (at 30). Dr. Freeman pointed out that transferring a patient by ambulance was not the same as bringing him to court: "[T]he problem attending a court session is you are not bringing someone in by ambulance under supervision to just go to another medical care facility. He is coming into the court for an extensive proceeding. If you are saying that you are going to bring him in with doctors and intravenous treatment and continued therapy during that time, its feasible. It’s not advisable” (at 31; emphasis added). When pressed, Dr. Freeman conceded that if the defendant had insisted on *571 going to court, she would have been unable to prevent it, but it would have been against medical advice (at 32). On redirect, she reiterated that it would have been medically inadvisable to move the defendant as long as he was receiving intravenous antibiotics (at 33).
Following Dr. Freeman’s testimony, the defendant, Peter Richards, testified on his own behalf. On direct examination, he stated that if he had been asked to come to court on Monday, November 23rd, prior to the second-look surgery, he would have been able to do so. He asserted that he would have appeared to continue with the trial "if he had no choice but to go” (at 38), but he admitted that he was unaware of the types of treatments (i.e., intravenous antibiotics) he was receiving (at 47-48).
On cross-examination, he further testified that he "only got a shot in [his] arm. [His] feet [were] okay” (at 50), yet he answered in the affirmative that he had been connected to i.v.’s at both Brooklyn Jewish and Kings County Hospital. Indeed, when the defendant was questioned by this court, he admitted that he rested and slept after each surgery (at 51-53); that he could eat only if his bed was raised (at 55); and that he was transferred from room to room on a bed, rather than in a wheelchair (at 56). Even several days after the second-look surgery, the defendant indicated that he was transferred from room to room on a bed (at 57).
At the conclusion of the hearing defense counsel made mention of an entry in defendant’s medical records dated November 23, 7:00 a.m. The defendant was observed to be "awake, alert and oriented. Skin dry and warm to the touch * * * Scheduled for operating room at 9 A.M. for second look at right hand. In no acute distress.” It is the defendant’s position that, as he was not in acute distress on Monday morning, he could have been produced in court before the second-look surgery, regardless of the fact that such move would have been against doctor’s advice.
It is this court’s conclusion that defendant’s position is totally unsupported by medical testimony, and defies common sense. Indeed, based upon Dr. Freeman’s testimony and medical records which state that the defendant continued to receive intravenous antibiotics until December 18, it is unlikely that he could have been brought from his hospital room into court without endangering his life before that date, at the earliest. It is even less likely that any branch of the criminal *572 justice system, including this court, would have initiated any procedure to force such a move.
The right of a criminal defendant to be present at all material stages of his trial is well settled. (See, People v Mehmedi, 69 NY2d 759; People v Ciaccio, 47 NY2d 431; People v Mullen, 44 NY2d 1; Maurer v People, 43 NY 1; People v Windley, 134 AD2d 386 [2d Dept].) This right is constitutional as well as statutory in nature (US Const 6th, 14th Amends; NY Const, art I, § 6; CPL 260.20, 310.40),[3] but must also have some "relation, reasonably substantial, to the fulness of [the defendant’s] opportunity to defend against the charge” (Snyder v Massachusetts, 291 US 97, 105-106; People v Wilson, 106 AD2d 146 [4th Dept]).
In keeping with that limitation, the Court of Appeals has held that "whether the mandate requiring the presence of a defendant at the trial of his indictment stems from due process or statute, literal application of its directive is not demanded. Common sense dictates that substantial performance of its terms is sufficient.” (People v Mullen, supra, at 5.)
The court went on to suggest portions of the proceedings at which the defendant’s presence is required. These include the impaneling of the jury, the introduction of evidence, the summations of counsel, and the court’s charge to the jury. Other cases have held that the giving of supplemental instructions to the jury during the course of deliberations is also considered a part of the trial during which the defendant must be present (see, People v Mehmedi, supra; People v Moore, 129 AD2d 590 [2d Dept], lv denied 70 NY2d 651). All of these proceedings are crucial because of their direct impact upon the defendant’s "opportunity to defend” (People v Mullen, supra; Maurer v People, supra; People ex rel. Lupo v Fay, 13 NY2d 253).
The defendant’s presence would not be absolutely required at a proceeding which was not a material part of the case or *573 where his presence "would be useless, or the benefit but a shadow” (Snyder v Massachusetts, supra, at 106-107; People v Wilson, supra, at 148). It is the opinion of this court that, for the reasons set forth below, the defendant’s presence was not required at the taking of the verdict, and his absence did not deprive him of due process.
CPL 310.40 (1) states that "[t]he verdict must be rendered and announced by the foreman of the jury in the courtroom in the presence of the court, a prosecutor, the defendant’s counsel and the defendant” (emphasis added). However, Judge Bellacosa, in his Practice Commentary, questioned the effect of the absence of one of the parties. Addressing himself to the absence of counsel, but speaking in terms which this court believes equally applicable to defendants, he questioned whether it might be possible to waive this requirement, "particularly if some emergency circumstances should develop where compliance is impossible.” (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 310.40, at 664.) In appropriate circumstances, he suggested, such a waiver might be the reasonable approach: "The contemplation of mistrial or extended sequestration of a jury which has reached a verdict as the only alternatives to the unavailability of any prosecutor or defense counsel in an emergency circumstance is not a pleasant choice. Thus, common sense and fairness should prevail permitting an appropriate waiver or dispensation from this new requirement. It should be read as merely directory rather than as mandatory and should not be permitted to affect the integrity of an otherwise proper jury verdict.” (Id., at 664; see also, People v Mullen, supra, 44 NY2d, at 5.)
In the instant case, as discussed above, it was clear that strict compliance with the statute’s directive was impossible without exacting a heavy toll from the jury. The defendant was unable to appear in court on the date the jury reached its verdict, and would have remained unavailable for a full month thereafter. It would have been grossly unfair to the members of the jury to needlessly sequester them for a full weekend or longer after they had already completed their work. This is a particularly important consideration because they had already spent one night away from their families. Certainly, it is the better practice to have the defendant present, and in most instances, where a defendant has a justifiable excuse for his absence, a short adjournment pending his appearance is most strongly preferred (People v Wind *574 ley, 134 AD2d 386, supra). It is clear, however, that such an adjournment would have been impractical, to say the least, and under the circumstances, this court made the only reasonable choice in accepting the verdict.
The defendant’s absence did not bear a substantial relation to the outcome of the trial or his opportunity to defend (Snyder v Massachusetts, 291 US 97, supra). He was present at all portions of the trial which might have had a substantial influence on the verdict, including the presentation of evidence, the summations of counsel, and the court’s charge to the jury (People v Wilson, 106 AD2d 146, supra). No action which could have influenced the verdict was taken in his absence. What he missed was merely the technical reading of a verdict that had already been reached, and his presence could in no way have altered the result (cf., People v Moore, 129 AD2d 590, supra; People v Webb, 134 AD2d 303 [2d Dept], lv denied 70 NY2d 939). Certainly, his rights were fully protected by counsel, who requested that the jury be polled and reserved all motions. The benefit to the defendant of being present would have been "but a shadow” (Snyder v Massachusetts, supra).
Finally, this court must note that defense counsel elected to proceed in his client’s absence. He did not request an adjournment nor did he immediately object to continuing (see, People v Colombani, 22 AD2d 956 [2d Dept], affd 16 NY2d 1055). After the taking of the verdict, he acted to protect his client’s rights by requesting the polling of the jury. It seems reasonable to infer "that defendant’s counsel concluded that the defendant’s absence would in no way be prejudicial to his position * * * or to his rights.” (Supra, at 957.)
This case presented most unusual circumstances. Viewing the situation as it appeared on Friday, November 20, this court sought to act in a manner consistent with its responsibility to protect the defendant’s rights, without sacrificing the orderly administration of justice. After a thorough fact-finding hearing, this court stands by its actions.
Accordingly, the defendant’s motion to set aside the verdict and dismiss the indictment is denied.

. See, CPL 330.30 (1); 330.50 (1); and 470.20 (1). A new trial would be required as a matter of law. Double jeopardy would not act as a bar to a new prosecution; where the termination of the prior trial was at the defendant’s request or on his motion, a retrial is possible. (CPL 40.30 [3]; cf., People v Catten, 69 NY2d 547 [mistrial].)

. All numbers refer to the transcript of the hearing held on May 2.

. Such right may be waived, expressly or impliedly, if there is a finding "that the waiver was knowing, voluntary and intelligent” (People v Windley, 134 AD2d 386, 387 [citing People v Parker, 57 NY2d 136; People v Epps, 37 NY2d 343, cert denied 423 US 999]). In this case, contrary to the assertions of the People, there is no evidence that the defendant knowingly or voluntarily waived his right to be present in court. Despite his late-night presence on the street, in a high-crime, drug-prone location, in front of a known crack house, the defendant cannot be said to have "sought” the injuries he received, and this court does not find a waiver, express or implied, in his conduct.